IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| CANADIAN BREAKS LLC, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 2:21-cv-00037-M-BP |
| | § | |
| JPMORGAN CHASE BANK, N.A., | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court are the Motion for Summary Judgment, supporting brief, and appendix filed by Defendant JPMorgan Chase Bank, N.A. ("JPM") (ECF Nos. 106-08, respectively), the Response, supporting brief, and appendix filed by Plaintiff Canadian Breaks LLC ("CB") (ECF Nos. 113-15, respectively), and JPM's Reply and appendix (ECF Nos. 116-17). The case was referred to the undersigned for pretrial management on September 2, 2022. ECF No. 93. After considering the pleadings and applicable legal authorities, the undersigned **RECOMMENDS** that Senior United States District Judge Barbara M. G. Lynn **GRANT** the Motion. The Court should **ENTER SUMMARY JUDGMENT** in JPM's favor on all claims.

## I.    BACKGROUND

CB owns and operates a wind energy farm located in the Texas Panhandle. ECF No. 108 at 22. JPM is a worldwide financial institution that trades commodities in the Texas energy market. *Id.* at 3-5. The Electricity Reliability Council of Texas ("ERCOT") manages that energy market. *Id.* at 149. ERCOT operates wholesale energy trading "hubs" where market participants can buy or sell wholesale energy as a commodity. *Id.* at 97.

CB and JPM entered into an agreement ("the Agreement"), in which CB agreed to schedule daily fixed quantities of energy for sale to JPM in exchange for payment of a fixed price of $19.55 per megawatt hour ("MWh") from January 1, 2020, through December 31, 2031. *See id.* at 285-480, 465. The Agreement consisted of several separate documents, making up a single contract that was "governed by [an ISDA] Master Agreement." *See* ECF No. 108 at 246. The Agreement also established a "tracking account" that was funded by a $20-million line of credit from JPM to CB to reconcile the monthly hedge transactions and cover CB's operational expenses. ECF No. 115 at 30-34, 38.

Under the Agreement, although CB produced energy at its wind farm, it did not sell that energy directly to JPM. ECF No. 108 at 97-98. Instead, the Agreement set up a two-part transaction. First, CB generated wind energy and sold it to ERCOT at the market price. Second, CB purchased from the market (at market price) the fixed quantity of energy that it agreed to deliver to JPM and sold that energy to JPM for $19.55 per MWh, the fixed price in the Agreement. *Id.* at 98, 113-15, 181, 489. Two-part transactions of this kind are normal in deregulated energy markets like that in Texas. Energy generators like CB's wind farm sell and pool energy into the Texas electrical grid, and purchasers may buy energy from the grid. *Id.* at 97. Without hedge agreements like the one at issue, producers and purchasers would have to buy and sell energy at the market price. Two-part transactions like the one in the Agreement allow producers like CB to hedge against low market prices and purchasers like JPM to hedge against high market prices.

CB and JPM based the fixed quantities of energy to be bought and sold under the Agreement on historical wind data and CB's energy generation in the past. ECF No. 108 at 72. Generally, those quantities make up around 82% of CB's base energy generation, meaning that most of the time CB produced excess energy that it simply sold into the grid at market price. ECF

No. 115 at 25. The parties expected CB to generate enough electricity from its wind farm to meet its obligations to JPM ninety-nine percent of the time. *Id.* at 97-98, 27-30. If CB produced less energy than it agreed to schedule for JPM's purchase, the Agreement required it to purchase on the open market any additional energy to deliver to JPM. ECF No. 108 at 465-66, 516 ("Physical delivery of the energy is required . . . even if the project didn't generate sufficient energy . . . ."), 156 ("Nothing in the parties' [Agreement] links the power generated at CB's wind farm to the fixed quantities of power that CB is required to schedule for delivery to [JPM.]"), 72-73, 11, 95. In a previous instance of extremely cold weather, during an October 2020 ice storm, CB did not produce any energy for six consecutive days, but it fully performed under the Agreement by purchasing and reselling the fixed quantities to JPM. *Id.* at 800, 809, 58-59. Apart from that ice storm and Winter Storm Uri ("Uri"), which is the focus of this case, CB never experienced prolonged periods of not producing energy. *Id.* at 806.

In Texas, when heightened energy demand coincides with low supply, ERCOT relies on "scarcity pricing" to encourage supply and discourage demand. ECF No. 115 at 538; ECF No. 108 at 151-52. A "System-Wide Offer Cap" limits ERCOT's scarcity pricing to a market cap. ECF No. 108 at 152. The Public Utility Commission of Texas ("PUCT") indirectly sets the System-Wide Offer Cap, which was $9,000 per MWh at the time relevant to this case. *Id.*

From February 9 to 19, 2021, Uri, one of the strongest winter storms in Texas history, "caused generation outages and a loss of electricity service to Texas customers several times more severe than" previous power outages. ECF No. 115 at 535, 634. In response to overwhelming demand for energy, ERCOT raised the market price for energy during certain periods of the storm to the System-Wide Offer Cap of $9,000 per MWh. *Id.* at 159-60. Concurrently, CB experienced

3

energy generation shortfalls during certain periods of the storm due to a combination of low temperatures and lack of wind. ECF No. 108 at 964; ECF No. 115 at 984, 988, 1004.

Despite these shortfalls, CB fully performed its obligations under the Agreement through February 13, 2021. *See* ECF No. 108 at 221-22, 1406, 964, 130. But from February 14 through February 19, 2021, CB scheduled only reduced quantities of energy that equaled the actual energy generation from its wind farm during this time, which was below the quantity it promised to schedule in the Agreement. ECF No. 108 at 221-22, 186, 104, 64. Around the same time, CB issued a notice of force majeure. *Id.* at 1021-22. Because of CB's nonperformance under the Agreement, JPM bought energy on the open market to cover its obligations to third parties. *See id.* at 11-13. As provided in the Agreement, JPM invoiced CB for the difference between the cost of the replacement energy and the price JPM would have paid CB had it performed as promised. *Id.* at 1147-58, 416-17. CB paid a fraction of the amount that JPM invoiced, based on the revenues that CB received from sale of energy that it was actually able to generate. *Id.* at 1142.

JPM sought to collect the remaining balance under the Agreement by (1) emptying funds from the tracking account (ECF No. 115 at 83-84); (2) setting an early termination date for the Agreement (*id.* at 126-28, 1024-25); and (3) commencing a foreclosure and sale process of CB's equity interests (which were pledged as collateral under the Agreement). ECF No. 108 at 1183-86. On February 11, 2022, CB paid the outstanding balance of JPM's invoice under protest. *Id.* at 1192-93, 198.

CB sued JPM, requesting (1) a declaratory judgment that the Agreement's force majeure provisions excused its nonperformance; and (2) damages for breach of contract based on JPM's collection efforts. ECF No. 1-1 at 10; ECF No. 69. JPM counterclaimed for (1) a declaratory judgment that the force majeure provisions of the Agreement did not excuse CB; and (2) damages

for breach of contract based on CB's nonperformance. ECF No. 78. CB raises a variety of affirmative defenses to JPM's breach of contract claim. ECF No. 81. JPM seeks summary judgment on all its claims. *See* ECF No. 107.

The central question for decision is whether Uri and its impacts constituted a force majeure event under the Agreement, excusing CB's non-performance. The summary judgment evidence and prevailing legal authorities show that the Agreement's force majeure provisions did not excuse CB's nonperformance. CB breached the Agreement, and its affirmative defenses fail. Finally, JPM's collection efforts were not improper. Thus, the Court should enter summary judgment for JPM on all of its claims.

## II.    LEGAL AUTHORITIES

### A.    Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact dispute is genuine if the evidence could lead "a reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* First, the movant must identify "portions of the record . . . demonstrat[ing] the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). Next, the burden shifts to the nonmovant to show that summary judgment is improper. *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Merely colorable evidence or evidence not

significantly probative will not defeat a properly supported summary judgment motion, and there must be more than a "scintilla of evidence" supporting the nonmoving party's position. *Anderson*, 477 U.S. at 249-50, 52.

Courts look to the full record, including the pleadings, depositions, answers to interrogatories, admissions, and affidavits, answering only the question of "whether there is a genuine issue for trial." Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 242-43. Courts view summary judgment evidence in the light most favorable to the nonmovant and resolve actual fact controversies—when both parties submit evidence of contradictory facts—in the nonmovant's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But the nonmovant is not entitled to assumptions in the absence of any proof. *Id*.

### B.    Choice of Law

In a case based on diversity jurisdiction, courts apply the "choice of law rules of the forum" state. *Ottemann v. Knights of Columbus*, 36 F.4th 600, 605 (5th Cir. 2022) (internal quotations omitted) (quoting *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003)). In Texas, a written choice-of-law provision is enforceable, if it (1) is part of a "qualified transaction"; and (2) bears "a reasonable relationship to the chosen jurisdiction." *Goosehead Ins. Agency, LLC v. Williams Ins. & Consulting, Inc.*, 533 F. Supp. 3d 367, 375 (N.D. Tex. 2020) (citing Tex. Bus. & Com. Code § 271.005). A "qualified transaction" involves a party that "pays or receives, or is obligated to pay or receive, consideration with an aggregate value of at least $1 million[.]" Tex. Bus. & Com. Code § 271.001 (West 2023). "[A] transaction bears a reasonable relation to a particular jurisdiction if . . . a party to the transaction is reasonably related to that jurisdiction," including if "a party to the transaction is a resident of that jurisdiction." *Id.*, § 271.004(a); (b).

The parties do not dispute that New York law applies under the Agreement, and the Court notes that (1) the transaction at issue is a qualified transaction; and (2) CB is a resident of New York. ECF No. 1. Consequently, the transaction bears a reasonable relationship to New York, the Agreement's choice-of-law provision controls, and the Court should apply New York law to resolve the case.

### C.    Rules of Contract Interpretation

New York's "general contract interpretation principles are well established." *Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022). "[A]greements are construed in accord with the parties' intent[, and] the best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* (internal quotations and brackets omitted) (quoting *Greenfield v. Philles Recs., Inc.,* 780 N.E.2d 166, 170 (N.Y. 2002)). Courts should be "especially reluctant" to read implicit statements into a contract and presume that where the contract was "negotiated at arm's length" by "sophisticated, counseled business people," any omissions were intentional. *Id.* (quoting *2138747 Ontario, Inc. v. Samsung C & T Corp.*, 103 N.E.3d 774, 780 (N.Y. 2018)). Courts must give the terms of the contract their plain meaning. *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014). Courts regularly reject constructions of contracts that render contractual language superfluous. *See Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of N.Y.*, 727 N.E.2d 563, 566-67 (N.Y. 2000).

#### 1.    Using Extrinsic Evidence

Extrinsic evidence is inadmissible unless the Court "finds an ambiguity in the contract." *Donohue*, 184 N.E.3d at 867. Courts may not use such evidence "to create an ambiguity in a written agreement" that is facially complete, clear, and unambiguous. *Id.* (quoting *W.W.W. Assoc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)). "A contract's silence on an issue does not

7

create 'an ambiguity which opens the door to . . . extrinsic evidence to determine the intent of the parties'" *Id.* (citing *Greenfield*, 780 N.E.2d at 171). So, ambiguities arise from "what was written so blindly and imperfectly that its meaning is doubtful," not from what was unwritten. *Id.* (internal quotations omitted).

### 2.   *Determining Ambiguity*

Whether a contract is ambiguous "is an issue of law for the courts to decide." *Greenfield*, 780 N.E.2d at 170. "Under [New York's] established standards, '[a] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Donohue*, 184 N.E.3d at 867 (citing *Greenfield*, 780 N.E.2d at 171). Courts may not alter the meaning where "the agreement on its face is reasonably susceptible of only one meaning." *Mieco LLC v. Pioneer Nat. Res. USA, Inc.,* No. 3:21-CV-1781-B, 2023 WL 2064723 *4 (N.D. Tex. Feb. 15, 2023) (citing *Greenfield*, 780 N.E.2d at 171-72) (applying New York law). A contract is ambiguous if it, "read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations" *Id.* (quoting *Ellington*, 21 N.E.3d 1000 at 1003). Construction and interpretation of unambiguous contracts are matters of law for the Court. *NRT N.Y., LLC v. Harding*, 16 N.Y.S.3d 255, 258 (App. Div. 2015).

### 3.   *Interpreting Force Majeure Clauses*

Courts must interpret force majeure clauses "in accord with their purpose, which is" limiting damages "where the reasonable expectation of the parties and the performance of the contract have been frustrated by circumstances beyond" the parties' control. *Constellation Energy Servs. of New York, Inc. v. New Water St. Corp.*, 46 N.Y.S.3d 25, 27 (App. Div. 2017) (internal

quotations omitted). "When the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." *Id.* Even so, courts generally only excuse nonperformance where the force majeure clause "specifically includes the event that actually prevents a party's performance[.]" *Kel Kim Corp. v. Cent. Markets, Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987) (collecting cases). "This maxim is especially true where the event relied upon to avoid performance is a market fluctuation[,]" and courts routinely refuse "to excuse performance under such a theory." *United States v. Panhandle E. Corp.*, 693 F. Supp. 88, 96 (D. Del. 1988) (applying New York law).

## III.    ANALYSIS

### A.    The Agreement's Force Majeure Provision did not Excuse CB's Nonperformance.

The Agreement provides: "To the extent either party is prevented by Force Majeure from carrying out, in whole or part, its obligations . . . then, unless the terms . . . specify otherwise, [that party] shall be excused from the performance of its obligations . . . ." ECF No. 108 at 268. The Agreement defines "Force Majeure" as:

> an event or circumstance which prevents the Claiming Party from performing its obligations under one or more Power Transactions, which event or circumstance was not anticipated as of the date the Power Transaction was agreed to, which is not within the reasonable control of, or the result of the negligence of, the Claiming Party, and which, by the exercise of due diligence, the Claiming Party is unable to overcome or avoid or cause to be avoided. Force Majeure shall not be based on (i) the loss of Buyer's markets; (ii) Buyer's inability economically to use or resell the Product purchased hereunder; (iii) the loss or failure of Seller's supply; or (iv) Seller's ability to sell the Product at a price greater than the Contract Price. Neither party may raise a claim of Force Majeure based in whole or in part on curtailment by the Transmission Provider unless (i) such party has contracted for firm transmission with a Transmission Provider for the Product to be delivered to or received at the Delivery Point and (ii) such curtailment is due to "force majeure" or "uncontrollable force" or a similar term as defined under the Transmission Provider's tariff; provided, however, that existence of the foregoing factors shall not be sufficient to conclusively or presumptively prove the existence of a Force Majeure absent a showing of other facts and circumstances which in the aggregate

with such factors establish that a Force Majeure as defined in the first sentence hereof has occurred.

*Id.* at 274.

The Agreement amended this language, adding: (1) "or to obtain the Product at a more advantageous price or under more advantageous terms and conditions" after the word "hereunder" in subsection (ii); and (2) "or under more advantageous terms to a third party purchaser" after the phrase "Contract Price" in subsection (iv). *Id.* at 305. Finally, the Agreement added this sentence at the end: "Notwithstanding the foregoing, Force Majeure shall not be based on an event of curtailment of production at the Project, or an inability to deliver energy from the Project to the ERCOT system." *Id.* at 303.

Under the Agreement, a "Claiming Party" is a party that "is prevented by Force Majeure from carrying out, in whole or in part, its obligations" and that "gives notice and details of the Force Majeure to the [non-claiming party] as soon as practicable . . . ." *Id.* at 268. "Power Transaction" means "transactions between the parties for the sale of a Product . . . on a spot basis or as an option to purchase, sell or transfer a Product[.]" ECF No. 108 at 267. "Seller" means the party "that is obligated to sell and deliver, or cause to be delivered, the Product[,]" or CB in this case. *Id.* at 275. "Buyer" means the party "that is obligated to purchase and receive, or cause to be received, the Product[,]" or JPM. *Id.* at 273. "Product" is "energy" that CB was to "sell and deliver, or cause to be delivered" to JPM. *Id.* at 274, 268, 455.

### 1. *"Supply" Plainly Means "CB's generated energy."*

The success of JPM's Motion depends on whether the events surrounding Uri constituted an event of force majeure under the Agreement. The parties dispute whether Uri "prevented" CB from performing and whether the circumstances surrounding Uri and its effect on CB meet the Agreement's definition of force majeure. Assuming, without deciding, that Uri prevented CB

10

from performing its obligations under the Agreement, the force majeure provision explicitly excludes the grounds that CB urges as force majeure.

Most force majeure clauses in reported New York cases list potential force majeure events. The Agreement does not. Instead, it states specific exceptions from the scope of the definition. One such exception is "the loss or failure of Seller's supply." ECF No. 108 at 274. The Agreement does not define "supply," and the term only appears in the force majeure section. JPM argues that "supply" plainly means "energy generated by [CB's] own Wind Farm." ECF No. 107 at 34. CB contends that "supply" is ambiguous and that the Agreement's negotiation history reveals that the parties intended "supply" to mean "replacement parts or the like" that "the Seller must procure through a supply chain to generate energy." ECF No. 114 at 42.

A New York state court considered identical language in the context of two wind farms asserting a force majeure event that Uri allegedly caused. *JPMorgan Ventures Energy Corp. v. Miami Wind I, LLC*, 179 N.Y.S.3d 892, *2 (Sup. Ct. 2022). The contract in that case defined force majeure as:

> an event or circumstance which prevents the Claiming Party from performing its obligations . . . , which event or circumstance was not anticipated as of the date the Power Transaction was agreed to, which is not within the reasonable control of, or the result of the negligence of, the Claiming Party, and which, by the exercise of due diligence, the Claiming Party is unable to overcome or avoid or cause to be avoided.

*Id.* The contract excluded from the definition: "(i) the loss of Buyer's markets; (ii) Buyer's inability economically to use or resell the Product purchased hereunder; (iii) *the loss or failure of Seller's supply*; or (iv) Seller's ability to sell the Product at a price greater than the Contract Price." *Id.* (emphasis in the original). The court held that the wind farms could not "rely on their inability to generate electricity at their respective windfarms during the storm to excuse their nonperformance"

11

because of the "loss or failure of Seller's supply" exception. *Id.* So, the court in *Miami Wind* interpreted "supply" to mean "seller's generated energy."

In a different Uri wind farm case involving similar "loss or failure of Seller's supply" language, the court reached the same conclusion. *See Stephens Ranch Wind Energy, LLC v. Citigroup Energy Inc.*, Index No. 652078/2021, NYSCEF No. 143 83-84 (Sup. Ct. Apr. 8, 2021). The judge commented, "I don't see that there can be any question that the supply was the wind energy that [the sellers were] seeking to provide." *Id.* He noted that the supply didn't come from an upstream provider, so the sellers "were designating wind and their ability . . . to take the wind that was available to them and generate power and send that downstream." *Id.*

Earlier this year, this Court in part relied on this exact "loss or failure of Seller's supply" interpretation in distinguishing the force majeure provision before it. *Mieco*, 2023 WL 2064723 *8 n.4 (citing *Miami Wind I*, 179 N.Y.S.3d 892, *4). *Mieco* dealt with Uri's impact on Texas's natural gas production. *Id.* *1. There, the storm caused the natural gas seller to lose its gas supply. *Id.* *6. The parties' force majeure provision provided that "the loss or failure of [seller's] gas supply or depletion of reserves, does not constitute force majeure, unless the loss or failure is caused by[,]" among other things, "weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe . . . ." *Id.* *5. Applying New York law, the Court found that this language unambiguously excused the natural gas seller's nonperformance. *Id.* *6.

The Court distinguished the contractual provision it interpreted from the one in *Miami Wind*, emphasizing that its agreement allowed for failure of seller's supply to constitute force majeure, while the agreement in *Miami Wind* did not. *Id.* *8 n.4 (quoting *Miami Wind I*, 179 N.Y.S.3d 892, *4) (internal punctuation omitted). The Court recognized that the contract in *Miami*

12

*Wind*, identical in relevant part to the Agreement here, "specifically provided that the loss or failure of Seller's supply did not constitute a force majeure event[.]" *Id.*

CB argues that the Court should disregard *Miami Wind*'s "supply" interpretation because that court ultimately ruled in favor of the wind farm. ECF No. 114 at 47-48 n.6. But in that case, the court denied a summary judgment motion because there was a fact issue as to whether it was possible for the wind farm to schedule and deliver the energy, not because of a different interpretation of "supply." *See Miami Wind I,* 179 N.Y.S.3d 892, *7. Here, there is no such fact issue, and the court's interpretation of "supply" in *Miami Wind* is applicable. Given the Agreement's use of the possessive "Seller's" in the exclusion suggests that the "supply" is owned or possessed by the seller. *See Mieco*, 2023 WL 2064723 *8. The supply that CB owned or possessed was the energy its wind farm generated, and "supply" means the energy that CB generated from its wind farm.

CB asserts that interpreting "supply" to mean "energy" is wrong because "Product," is already defined as "energy." ECF No. 114 at 41. But this definition does not preclude "supply" from meaning "CB's generated energy." Under the Agreement, "Product" was the energy to be delivered to JPM. *See* ECF No. 108 at 268. CB fully performed and delivered Product during the early days of Uri, despite generating less energy than the required quantity to be delivered. *See* ECF No. 108 at 221-22, 1406, 964, 130. Similarly, CB previously fully performed despite producing no energy for six consecutive days. *Id.* at 800. Therefore, "Product" cannot mean "CB's generated energy." Further, the Agreement defines no other term as "CB's generated energy," so this interpretation does not conflict with any of Agreement's provisions.

Next, CB asks the Court to consider the negotiation history and to read "supply" as "items that Seller must procure through a supply chain to generate energy." ECF No. 114 at 42. But the

Court cannot consider extrinsic evidence unless a term is ambiguous, and extrinsic evidence may not be used to create an ambiguity. *Donohue*, 184 N.E.3d at 867. Because "Seller's supply" is not ambiguous, the Court cannot consider extrinsic evidence. If the parties had intended to limit "loss or failure of Seller's supply" to "loss or failure of Seller's supply chain," they could have inserted "chain" after "supply." *Avon Co. v. Fareva Morton Grove, Inc.*, No. 22-CIV-4724-(AKH), 2022 WL 2208156 *6 (S.D.N.Y. June 21, 2022) (Sophisticated parties' failure to impose specific limitation "is strong evidence that the omission was intentional."). But CB and JPM did not do so, and "supply" does not mean "supply chain."

Also, CB argues that the Court should discard this reading of "supply" because it would render the curtailment exception superfluous. The Agreement provides: "Notwithstanding the foregoing, Force Majeure shall not be based on an event of curtailment of production at the Project[.]" ECF No. 108 at 303 (amending the Agreement's force majeure definition). "Curtailment," according to CB, "is an industry term of art" that occurs when the transmission line owner or ERCOT orders energy producers to not generate electricity. ECF No. 114 at 40-41 n.5 (citing ECF No. 115 at 41). Interpreting "supply" as noted above does not render the "curtailment" exception superfluous. Nothing in the Agreement prevents "loss of Seller's supply" and "curtailment" to coexist as separate instances that do not constitute force majeure.

Finally, CB argues that this definition of "supply" would defeat the purpose of the force majeure clause and lead to the absurd result that CB would have to perform for the entire term of the Agreement even if a natural disaster destroyed its wind farm. *See* ECF No. 114 at 43. But the Court "cannot rewrite an agreement entered into between knowledgeable parties and effect a result in the derogation of its express terms." *Bayside Fed. Sav. & Loan Ass'n v. Cord Meyer Dev. Co.*, 281 N.Y.S.2d 893, 895 (App. Div. 1967). New York courts construe force majeure clauses

narrowly, and often allow "what in effect are 'hell or high water' provisions." *Hugo Boss Retail, Inc. v. A/R Retail, LLC*, 145 N.Y.S.3d 329, *10 (Sup. Ct. 2021) (collecting cases in which the contracts require lessees to pay rent, even "despite the failure of performance by the lessor"). Thus, the Court must narrowly construe the Agreement's force majeure clause and implement as written the words that the sophisticated parties chose.

### 2. *CB's Force Majeure Declaration was Based on Supply.*

CB rightly urges the Court to consider all of the reasons that it declared that force majeure excused its nonperformance. ECF No. 114 at 40. CB argues that it declared a force majeure event based both on reduced energy generation at its wind farm and ERCOT's extraordinary action in raising the market price to the System-Wide Offer Cap. *See Luminant Energy Co. LLC v. Pub. Util. Comm'n of Tex.*, 665 S.W.3d 166, 191 (Tex. App.—Austin 2023, pet. filed) ("[T]he Commission exceeded its power by eliminating competition entirely."). For the reasons just stated, loss of CB's supply (the reduced energy generation) is not an instance of force majeure under the Agreement.

The parties dispute whether financial hardship may constitute force majeure under New York law, but the question is irrelevant because financial hardship did not prevent CB's performance. Had CB's supply not failed, it could have performed under the Agreement regardless of the market price that ERCOT set. If the wind had continued to blow at historical levels throughout Uri, CB could have sold its energy on the open market, received in return whatever the market price was, and then used that to purchase the energy that the Agreement obligated it to schedule for delivery to JPM. Thus, only a lack of supply caused CB's nonperformance, not financial hardship. CB confirmed as much when it sought to remit payments to JPM correlating with sales of energy that it "was actually able to generate" during the storm,

showing that the true limitation on its performance was the failure of its supply. ECF No. 108 at
1142. So, even considering all of the factors affecting CB's nonperformance, the failure of CB's
supply was the cause. Because the Agreement precludes failure of CB's supply as a force majeure
event, force majeure did not excuse CB's nonperformance.

    **B.    CB Breached the Agreement.**

    Under the Agreement, if CB fails to perform, then CB must pay JPM the difference
"obtained by subtracting the Contract Price from the Replacement Price." ECF No. 108 at 268-
69. The Agreement defines "Replacement Price" in relevant part as: "the price at which [JPM],
acting in a commercially reasonable manner, purchases . . . a replacement" for any undelivered
Product, plus any "reasonably incurred" costs or transmission charges. *Id.* at 274. To plead breach
of contract against CB, JPM must allege (1) the existence of a contract; (2) its performance under
the contract; (3) CB's breach; and (4) resulting damages. *34-06 73, LLC v. Seneca Ins. Co.*, 198
N.E.3d 1282, 1287 (N.Y. 2022) (collecting cases).

    CB argues that JPM "failed to prove its performance," precluding summary judgment.
ECF No. 114 at 47. It asserts that JPM did not "perform its duty to obtain replacement energy in
a 'commercially reasonable' manner," because it bought replacement energy for $9,000 per
MWh. ECF No. 114 at 47. Relying on caselaw dealing with commercial reasonableness in the
banking context, CB asserts that commercial reasonableness "is often a fact-intensive inquiry[.]"
*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 542 (S.D.N.Y.
2013); *Jones v. Cmty. Bank of Sullivan Cnty.*, 762 N.Y.S.2d 133, 135 (App. Div. 2003) ("Whether
a bank acts in accordance with reasonable commercial standards generally presents a question of
fact.") (citing *Holland Am. Cruises, Inc. v. Carver Fed. Sav. & Loan Ass'n*, 400 N.Y.S.2d 64
(1977)). Even so, "where the material facts are undisputed, the Court may decide as a matter of

law that [a party's] actions were commercially reasonable." *Leigh Co. v. Bank of New York*, 617 F. Supp. 147, 153 (S.D.N.Y. 1985).

Here, CB raises no genuine fact issue as to the commercial reasonableness of JPM's purchase. It argues that JPM "acted unreasonably by purchasing replacement energy at over 450 times the contract's fixed rate, particularly in light of the unlawful overcharges and its own force majeure rights." ECF No. 114 at 48 (emphasis removed). JPM responds that it could not circumvent the market price, even if it was an unlawful overcharge since purchasers "can't negotiate market prices." ECF No. 108 at 99-100. Likewise, JPM performed under its contract with a third party, so the issue of invoking its force majeure rights is inapplicable. The purpose of a force majeure clause is to limit damages where the performance of the contract has been frustrated by external circumstances. *Constellation Energy Servs. of New York, Inc.*, 46 N.Y.S.3d at 27. External forces did not frustrate JPM's performance. ECF No. 108 at 786. Therefore, CB raises no fact issue as to the commercial reasonableness of JPM's actions. Consequently, there is no genuine issue of material fact as to JPM's performance, and the Court should grant JPM's motion for summary judgment on its breach of contract claim.

### C.     CB's Affirmative Defenses Fail.

CB raises several affirmative defenses on which JPM seeks summary judgment. ECF No. 107 at 43-45. CB offers a blanket argument that JPM failed to negate these defenses as a matter of law and only seeks to raise a genuine issue of fact for trial on JPM's alleged failure to mitigate damages. ECF No. 114 at 48-49. However, JPM successfully carried its burden of showing no genuine dispute material fact on each of CB's affirmative defenses. Thus, to survive JPM's Motion, CB must raise a genuine issue of material fact for trial. *See Duckett*, 950 F.2d at 276.

### 1.    *Frustration of Purpose*

Under New York law, frustration of purpose is narrowly available as a defense only where the purpose of the contract was "completely thwarted." *Valentino U.S.A., Inc. v. 693 Fifth Owner LLC*, 160 N.Y.S.3d 858, 859 (App. Div. 2004). The record shows that the Agreement achieved its intended purpose of protecting the parties from the volatility of the energy market according to the contractual provisions to which the parties agreed. CB raises no contrary fact issue as to the purpose of the Agreement, so the Court should grant the Motion on this defense.

### 2.    *Impossibility*

In New York, impossibility "excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible." *Kel Kim Corp.*, 519 N.E.2d at 296. The summary judgment evidence showed that JPM was a party to a downstream agreement that obligated it to sell the exact same fixed quantities of energy to a third party and that it successfully performed those obligations. *Compare* ECF No. 108 at 767-769 *with id.* at 465-473; *id.* at 11-12, 786. Thus, it was possible for CB to purchase and sell the same quantities of energy to JPM, and performance of the Agreement was not impossible. CB raises no fact issue to the contrary, and summary judgment is appropriate.

### 3.    *Mistake*

Nothing in the record suggests any sort of unilateral or mutual mistake, and CB failed to show any fact issue to the contrary. Summary judgment is proper here.

### 4.    *Unconscionability*

Under New York law, the doctrine of "unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties." *NML Cap. v. Republic of Argentina*, 621 F.3d 230, 237 (2d Cir. 2011). A provision is

unconscionable if it is "both procedurally and substantively unconscionable when made." *Id.* (internal citations omitted). There is no evidence that the Agreement was unreasonable, nor that either CB or JMP had grossly unequal bargaining power in its execution. JPM is entitled to summary judgment on this defense.

### 5.    *Failure to Mitigate Damages*

"It is the breaching party's burden to prove that a [non-breaching party] could have lessened its damages." *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985). Failure to mitigate "requires the defendant to establish not only that the plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the damages." *Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 346 (S.D.N.Y. 2021). Whether a party sufficiently tried to mitigate damages is a question of fact. *Id.* The duty to mitigate damages applies to damages "the plaintiff could have avoided with reasonable effort and without undue risk, burden, or expense." *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440-41 (S.D.N.Y. 2010). This duty does not obligate the plaintiff to "undertake extraordinary and costly measures." *Carrols Equities Corp. v. Villnave*, 395 N.Y.S.2d 800, 803 (1977). Nor does it require parties to expose themselves to "unreasonable risk or expense." *Janowitz Bros. Venture v. 25-30 120th St. Queens Corp.*, 429 N.Y.S.2d 215, 221 (1980).

JPM contends that because it "was powerless to negotiate or pay any lower price[,]" for replacement energy, it could not mitigate its damages, rendering this defense meritless. ECF No. 107 at 44-45. CB argues that JPM's actions did not conclusively establish that it could not have mitigated its damages, and that JPM should have either (1) invoked a force majeure defense to its separate contract; or (2) "sought a refund" of the inflated market energy prices from ERCOT "as the plaintiffs in *Luminant* have done." ECF No. 114 at 49. As previously discussed, the events

surrounding Uri did not prevent JPM's performance of its downstream contract, and JPM did not invoke the force majeure provisions. *See Supra* Section III.B. CB raises no fact issue on this point.

Nor does CB raise a fact issue by suggesting that JPM could have reduced its damages by suing ERCOT or some other party. "[S]peculation, and unsubstantiated assertions are inadequate to satisfy" CB's summary judgment burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). The only evidence that CB argues to show that JPM did not mitigate its damages is the testimony of a JPM representative who testified that he did not know whether JPM was "doing anything to seek a refund" for the excess amount that it had to pay to fulfill its contract. ECF No. 115 at 114. CB has offered no evidence to show that JPM could have obtained a "refund" of any kind from ERCOT or any other party that would reduce its damages that CB caused by breaching the Agreement.

Additionally, whether JPM could have recovered a judgment against ERCOT for a refund is sheer speculation, not reliable evidence that such a suit would actually have lessened JPM's damages. *See Mohegan Lake Motors, Inc.*, 559 F. Supp. 3d at 346. Lawsuits inherently are risky, expensive, and anything but certain. The *Luminant* case is still pending before the Texas Supreme Court, and it is unclear whether the Texas courts will grant relief for ERCOT's actions during Uri. *See* Petition for Review, *Pub. Util. Comm'n of Tex. v. Luminant Energy Co. LLC*, 23-0231 (Tex. Mar. 23, 2023). The Court views the evidence most favorably to CB, but CB is not entitled to assumptions in the absence of any proof. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Here, there is no proof that JPM could have lessened its damages if it had chosen to invoke the force majeure provision of its separate contract with a downstream third party or if it had sued ERCOT for a refund of extremely high prices paid for energy on the open market.

### D.      JPM did not Breach the Agreement.

Finally, JPM moves for summary judgment on CB's claim that it breached the Agreement through heavy-handed collection efforts. ECF No. 107 at 45-46. JPM argues that because force majeure did not excuse CB's nonperformance, CB's breach of contract claim necessarily fails. *Id.* at 46. Under the Agreement, "[e]ither Party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice, or information forming the basis for an invoice, . . . " and payments of disputed amounts are not required while the dispute was pending. ECF No. 108 at 301-02. JPM argues that this provision only speaks to "computational disputes that may arise in the course of the parties' monthly invoicing process[,]"not where "one party claims that an invoice should never have existed in the first place." ECF No. 107 at 46.

CB does not answer either of these arguments directly and instead relies wholly on assertions in the Facts section of its brief, with minimal citations to the record. ECF No. 114 at 21. CB claims that JPM beached the Agreement by attempting to collect the invoice for additional energy that it had to acquire on the open market while CB was disputing the invoice. *Id.* CB asserts that JPM breached when it (1) drained the tracking account "to pay itself and refus[ed] to pay [CB] millions of dollars due on invoices"; (2) "purported to terminate the contract early" and demanded "a large early termination payment"; and (3) started to foreclose on CB's interests in the wind farm. *Id.* at 21. CB focuses on the foreclosure, arguing that it was premature because the issue of force majeure had not been adjudicated when JPM began its efforts. *Id.* at 22.

CB's argument fails to present a fact issue for trial. Under the Agreement, (1) the parties may offset any amounts owed; (2) the non-defaulting party may designate an early termination date; and (3) the non-defaulting party may foreclose on the equity interests of the other party. ECF No. 108 at 247, 253-56. Thus, because CB's reliance on the force majeure clause was

improper, it breached the Agreement. CB raises no fact issue to show that JPM could not exercise any of the complained of contractual remedies if CB were in breach of the Agreement.

Moreover, "[a] party's obligation to perform under a contract is only excused where the other party's breach of contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (applying New York Law). Here, CB's unexcused nonperformance defeated the entire object of the Agreement, which was to sell fixed quantities of energy to JPM at a fixed price. Thus, even if JPM's collection efforts were in breach of the Agreement, upon CB's breach, JPM no longer was obligated to perform its duties under the Agreement. Accordingly, JPM is entitled to summary judgment on its breach of contract claim.

### E.    JPM is Entitled to Damages.

Neither JPM nor CB offered summary judgment evidence quantifying JPM's damages for breach of contract. Nevertheless, JPM is entitled to recover damages for CB's breach of the Agreement. "New York courts have long led that uncertainty in the amount of loss caused by a breach of contract, or even the complete absence of damages resulting from the breach, does not defeat a breach of contract claim." *McCoy Assocs., Inc. v. Nulux, Inc.*, 218 F. Supp. 2d 286, 294 (E.D.N.Y. 2002) (footnote omitted) (collecting New York cases). This is because even where "the breach of contract caused no loss or if the amount of loss cannot be proved with sufficient certainty, the injured party is entitled to" nominal damages. *Hirsch Elec. Co. v. Cmty. Servs.*, Inc., 536 N.Y.S.2d 141, 143 (App. Div. 1988). And because "nominal damages are always available for a breach of contract, proof of actual damages is not necessary." *Utica Mut. Ins. Co. v. INA Reinsurance Co.*, No. 612CV00194DNHTWD, 2012 WL 12874471 *7 (N.D.N.Y. Nov. 6, 2012) (applying New York law). "[T]he law infers some damage" whenever "there is a breach of

contract[.]" *Finley v. Atlantic Transp. Co.*, 115 N.E. 715, 718 (N.Y. 1917). Therefore, that JPM's damages "are uncertain, or may not even exist, is an insufficient reason to deny [its] summary judgment motion." *McCoy*, 218 F. Supp. 2d at 293-94 (granting a party's motion for summary judgment where it only established "existence of a contract and its breach").

Although JPM is entitled to recover damages, there is no summary judgment evidence to support an award of damages in a particular amount. Accordingly, the issue of the amount of those damages remains for trial. *See Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 923 N.Y.S.2d 482, 483 (2011) (the amount of "damages is a factual inquiry"). Additionally, under the Agreement, JPM is entitled to all allowable prejudgment and post-judgment interest, costs and expenses of this litigation, and reasonable attorney's fees. *See* ECF No. 108 at 258.

## IV.   CONCLUSION

The summary judgment evidence shows that: (1) the events surrounding Winter Storm Uri did not constitute a force majeure event under the Agreement; (2) CB breached the Agreement by failing to perform; (3) none of the other affirmative defenses that CB asserted excuse its nonperformance; (4) JPM did not breach the Agreement by exercising its contractual collection remedies; and JPM is entitled to damages for breach of contract in an amount to be determined at trial. No genuine dispute of material fact remains on any issue, and JPM is entitled to judgment as a matter of law. Accordingly, the undersigned **RECOMMENDS** that Senior United States District Judge Barbara M. G. Lynn **GRANT** JPM's Motion for Summary Judgment on all claims, **ENTER SUMMARY JUDGMENT** in favor of JPM, and **DISMISS** CB's claims against it with prejudice. The case then should proceed to trial to determine JPM's damages caused by CB's breach of the Agreement.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). To be specific, an objection must identify the particular finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

**SIGNED** on September 29, 2023.

Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE