## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| CANADIAN BREAKS LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 2:21-cv-00037-M |
| | § | |
| JPMORGAN CHASE BANK, N.A., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 3 and 4, 2024, the Court held a non-jury trial in this matter. During the proceedings, the Court received evidence and heard sworn testimony. On March 28, 2025, after substantial post-trial briefing, the Court held a post-trial oral argument. Having considered the evidence, testimony, and oral arguments presented, along with the applicable law, the Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACT

I.   **The Parties**

1. Plaintiff Canadian Breaks LLC ("Canadian Breaks") owns and operates a 210.1-megawatt wind farm in Oldham and Deaf Smith Counties, TX (the "Wind Farm"). Canadian Breaks is owned by a series of institutional investors, including Northleaf Capital, which serves as Canadian Breaks's managing member and a role like a parent entity.

1

2. Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") is a financial institution that participates in various commodities trading activities, including in the Texas energy market.

II.    **ERCOT and the Texas Energy Market**

3. The Electricity Reliability Council of Texas ("ERCOT") manages the market for the purchase and sale of energy in Texas, and is subject to oversight by the Public Utility Commission of Texas ("PUCT").

4. Market prices for energy in the ERCOT market are based largely on principles of supply and demand. ERCOT's regulations allow it to impose price adders, such as the Reliability Deployment Price Adder ("RDPA").

III.    **The Parties' Agreement**

5. Canadian Breaks and JPMorgan executed a fixed-volume energy hedge agreement on June 15, 2018 (the "Agreement"). The overall Agreement consists of a number of separate documents, including: an ISDA[1] Master Agreement; the ISDA North American Power Annex ("the Power Annex"); an ISDA Schedule containing the parties' modifications to the ISDA Master Agreement and the Power Annex ("the Schedule"); the 2010 ISDA ERCOT Protocol; Schedule P to the Master Power Purchase & Sale Agreement published by the Edison Electric Institute; and two confirmations setting forth the specific terms of the transactions to be performed by the parties.

6. The Agreement requires Canadian Breaks to sell fixed hourly quantities of energy to JPMorgan at the ERCOT North 345kV trading hub ("ERCOT North Hub" or "Delivery Point"). JPMorgan pays Canadian Breaks $19.55 for each megawatt hour (MWh) of

---

[1] International Swaps and Derivatives Association, Inc.

energy that Canadian Breaks sells under the Agreement.  The Agreement's term runs from January 1, 2020, to December 31, 2031.

7.  The energy Canadian Breaks sells to JPMorgan at the ERCOT North Hub is not energy Canadian Breaks generates at its Wind Farm.  Rather, Canadian Breaks engages in two kinds of transactions: (1) Canadian Breaks generates fluctuating amounts of energy at its Wind Farm, which it sells to ERCOT at the prevailing market price; and (2) Canadian Breaks purchases fixed quantities of energy required by the Agreement at the prevailing market price at the ERCOT North Hub, and then immediately re-sells those quantities to JPMorgan at a fixed price of $19.55/MWh.  Under this structure, JPMorgan bears the risk if the market price at the ERCOT North Hub is lower than $19.55/MWh, and Canadian Breaks bears the risk if the market price at the ERCOT North Hub is higher than $19.55/MWh.

8.  Because the Agreement requires Canadian Breaks to sell JPMorgan fixed hourly quantities of energy, Canadian Breaks must "schedule" its required hourly sales regardless of whether its Wind Farm generates power during a given hour.

9.  The Agreement includes a $20 million working capital facility known as a "Tracking Account," which provides Canadian Breaks with access to working capital during times when its Wind Farm generates less than the fixed quantities in the Agreement.

10. The Agreement provides:  "To the extent either party is prevented by Force Majeure from carrying out, in whole or part, its obligations . . . then, unless the terms . . . specify otherwise, [that party] shall be excused from the performance of its obligations."  The Agreement defines "Force Majeure" as:

> an event or circumstance which prevents the Claiming Party from performing its obligations under one or more Power Transactions,

3

which event or circumstance was not anticipated as of the date the Power Transaction was agreed to, which is not within the reasonable control of, or the result of the negligence of, the Claiming Party, and which, by the exercise of due diligence, the Claiming Party is unable to overcome or avoid or cause to be avoided. Force Majeure shall not be based on (i) the loss of Buyer's markets; (ii) Buyer's inability economically to use or resell the Product purchased hereunder; (iii) the loss or failure of Seller's supply; or (iv) Seller's ability to sell the Product at a price greater than the Contract Price. Neither party may raise a claim of Force Majeure based in whole or in part on curtailment by the Transmission Provider unless (i) such party has contracted for firm transmission with a Transmission Provider for the Product to be delivered to or received at the Delivery Point and (ii) such curtailment is due to "force majeure" or "uncontrollable force" or a similar term as defined under the Transmission Provider's tariff; provided, however, that existence of the foregoing factors shall not be sufficient to conclusively or presumptively prove the existence of a Force Majeure absent a showing of other facts and circumstances which in the aggregate with such factors establish that a Force Majeure as defined in the first sentence hereof has occurred.

11. The Agreement provides that in the event Canadian Breaks fails to schedule the fixed hourly quantities required by the Agreement, JPMorgan is entitled to invoice Canadian Breaks for the difference between the fixed price in the Agreement ($19.55/MWh) and the "Replacement Price" JPMorgan paid to purchase replacement energy. The Agreement defines "Replacement Price" as follows:

(A) the price at which Buyer, acting in a commercially reasonable manner, purchases for delivery at the Delivery Point a replacement for any Product specified in a Power Transaction but not delivered by Seller, plus (i) costs reasonably incurred by Buyer in purchasing such substitute Product and (ii) additional transmission charges, if any, reasonably incurred by Buyer to the Delivery Point, or absent a purchase, (B) the market price at the Delivery Point for such Product not delivered as determined by Buyer in a commercially reasonable manner; provided, however, in no event shall such price include any penalties, ratcheted demand or similar charges, nor shall Buyer be required to utilize or change its utilization of its owned or controlled assets or market positions to minimize Seller's liability. For the purposes of this definition, Buyer shall be considered to have purchased replacement Product to the extent Buyer shall have

4

entered into one or more arrangements in a commercially reasonable manner whereby Buyer repurchases its obligation to sell and deliver the Product to another party at the Delivery Point.

12. The source of the phrase "ratcheted demand or similar charges" in the Replacement Price definition in the parties' Agreement is the Power Annex, a form agreement incorporated into the Agreement.[2]

13. Section 5(v) of the Schedule provides the relevant conditions for disputing invoices:

> Either Party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice or information forming the basis for an invoice, rendered under a Transaction other than any obligation under Section 6 of the Agreement within twelve (12) months of the date such invoice, or adjustment to an invoice, was rendered. In the event an invoice or portion thereof, or any other claim or adjustment arising hereunder, is disputed, payment of the undisputed portion of such invoice shall be required to be made when due. A Party asserting an invoice dispute shall do so in a written notice setting forth the basis for the dispute. Payment of disputed amounts shall not be required while a dispute is pending. Upon resolution of the dispute, any required reimbursement or other payment shall be made within five (5) Local Business Days of such resolution along with interest accrued at the Default Rate from (and including) the date paid or the due date, as the case may be, to (but excluding) the date paid following the resolution of the dispute. Inadvertent overpayments shall be returned upon request or deducted by the Party receiving such overpayment from subsequent payments, with, without duplication of any negative tracking account interest payable pursuant to the Project Confirmation, interest accrued at the Non-default Rate from (and including) the date of such overpayment to (but excluding) the date repaid or deducted by the Party receiving such overpayment. Any dispute with respect to an invoice or invoice adjustment is waived unless the other Party is notified in accordance with this Part 5(v) within twelve (12) months after the issue date of such invoice or adjustment.

---

[2] The parties' Agreement incorporates form provisions irrelevant to the parties' transactions. For example, the Agreement contains a sovereign immunity waiver that is inapplicable here.

IV.    **JPMorgan's Agreement with BP**

14. At or about the same time the parties executed their Agreement, JPMorgan also entered into a downstream agreement with BP (the "Downstream Agreement"). The Downstream Agreement requires JPMorgan to sell to BP the exact same fixed hourly quantities of energy that it purchases from Canadian Breaks. BP pays JPMorgan a fixed price of $20.70/MWh for the energy it purchases under the Downstream Agreement, which is $1.15/MWh higher than the fixed price JPMorgan pays Canadian Breaks ($19.55/MWh).

15. JPMorgan's obligation to sell energy to BP is independent of Canadian Breaks's performance under its Agreement with JPMorgan.

V.    **Winter Storm Uri and ERCOT's Pricing During the Storm**

16. While Canadian Breaks's Wind Farm generated energy every day during a very substantial winter storm named Uri, the weather conditions caused by Uri resulted in the Wind Farm generating less than the fixed quantities in the Agreement for certain periods during the Storm. Nonetheless, Canadian Breaks successfully scheduled with ERCOT for the full fixed quantities of energy called for by the Agreement from February 9–13, 2021.

17. ERCOT requires market participants to post collateral as security for their trading activities in the ERCOT market. As energy prices continued to rise during Uri, the amount of collateral Canadian Breaks was required to post in order to continue trading increased significantly.

18. As Uri continued and ERCOT continued to make larger collateral calls, Canadian Breaks stopped scheduling fixed quantities for delivery to JPMorgan, and instead Canadian Breaks sent to JPMorgan on February 15, 2021, a Force Majeure Notice, dated February 14, 2021.[3]

_____

[3] Canadian Breaks's asserted force majeure period was later stated to be February 9, 2021,

The Force Majeure Notice asserted that the weather conditions associated with Uri prevented Canadian Breaks from fully performing its obligations under the Agreement, but made no reference to "penalties, ratcheted demand or similar charges."

19. JPMorgan responded to the Force Majeure Notice on February 15, 2021, rejecting the validity of Canadian Breaks's force majeure declaration.

20. Several other windfarms operating through ERCOT in dealing with JPMorgan also sent notices of force majeure to JPMorgan during Uri.

21. During Uri, the wind did not blow anywhere near its historic trends and the energy market failed to deliver adequate power to Texas residents—indeed, the electric grid was near collapse. Regulators imposed rolling blackouts to prevent such an outcome, and the State of Texas and its regulators issued emergency orders to address the energy shortage. On February 12, 2021, pursuant to Texas Government Code § 418.014, Governor Greg Abbott issued a Declaration of a State of Disaster for all counties in Texas. On February 15, 2021, ERCOT declared its highest state of emergency due to exceptionally high electric demand, which exceeded supply.

22. In determining whether to declare force majeure, Canadian Breaks obtained counsel from the law firm of McDermott Will & Emery.

23. On February 15, 2021, ERCOT ordered transmission operators in the ERCOT market to "shed" more than 10,000 megawatts (MW) of firm load, *i.e.*, blackouts, to help maintain the balance of supply and demand on the grid.

24. Later on February 15, 2021, the PUCT issued an Order directing ERCOT to ensure prices accurately reflected the conditions in the market, *i.e.*, "[i]f customer load is being shed,

---

at 3:00 a.m. to February 19, 2021, at 10:59 a.m. *See infra*, Findings of Fact, paragraph 35.

scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest."[4]  ERCOT implemented the PUCT's February 15, 2021, Order, setting prices at a $9,000/MWh market cap "by making an administrative adjustment" through the RDPA.

## VI.     <u>Implications of the Parties' Performance, or Lack Thereof, During the Storm</u>

25. JPMorgan performed its obligations under its Downstream Agreement with BP throughout Uri by scheduling sales of the fixed quantities of energy set forth therein.  Because Canadian Breaks failed to schedule the fixed quantities in the Agreement from February 14–19, 2021, JPMorgan was forced to purchase those quantities from ERCOT at market prices in order to fulfill its obligations to BP, often at $9,000/MWh.

26. JPMorgan was unable to negotiate or pay a price lower than the market price set by ERCOT in the real-time market to acquire replacement energy.

27. During periods where ERCOT market prices were at the $9,000/MWh price cap, JPMorgan lost $8,979.30/MWh on its sales to BP.  In total, JPMorgan was forced to pay over $79 million out-of-pocket to fulfill its obligations to BP from February 14–19 due to Canadian Breaks's nonperformance.

## VII.     <u>Replacement Price Invoices and "Penalties, Ratcheted Demand or Similar Charges"</u>

28. In light of Canadian Breaks's failure to deliver the fixed quantities required by the Agreement, JPMorgan exercised its right to invoice Canadian Breaks for the difference between its Replacement Price and the $19.55/MWh contract price (the "Replacement

---

[4] In June 2024, the Supreme Court of Texas unanimously affirmed the legality and validity of the PUCT's Orders during Uri, "the effect of which was to raise the market price of electricity to the regulatory ceiling of $9,000/MWh." *Pub. Utility Comm'n of Tex. v. Luminant Energy Co. LLC*, 691 S.W.3d 448, 452 (Tex. 2024).

Price invoices"). JPMorgan's Replacement Price invoices did not include costs or charges exceeding the prices it paid to purchase replacement energy on ERCOT's real-time market. Those invoices were for the trading days of February 14, 15, 16, 17, 18 and 19, 2021, and they totaled $79,175,323.86. These invoices were sent to Canadian Breaks by JPMorgan between February 22 and March 1, 2021.

29. As required by section 6(c)(i) of the Agreement, JPMorgan provided "reasonable detail" in the Replacement Price invoices.

30. On March 1, 2021, Canadian Breaks sent JPMorgan a notice purporting to dispute the Replacement Price invoices under Section 5(v) of the Schedule, based on its prior force majeure declaration. This dispute notice mentioned potential "re-pricing," but did not refer to "penalties, ratcheted demand or similar charges."[5]

31. On March 25, 2021, Canadian Breaks sent JPMorgan a letter regarding the Replacement Price invoices. Although the letter discussed "commercially unreasonable prices" and the possibility of a "reprice," it did not mention "penalties, ratcheted demand or similar charges."

32. Canadian Breaks relies on a calculation prepared by its expert, Dr. Shams Siddiqi, claiming that it is a quantification of allegedly "improper charges" included in JPMorgan's Replacement Price invoices. Dr. Siddiqi does not contend that the increased costs invoiced by JPMorgan to Canadian Breaks constitute "penalties, ratcheted demand or similar charges." Indeed, the term "ratcheted demand" does not appear in Dr. Siddiqi's expert report.

---

[5] Canadian Breaks also filed in state court, on March 1, 2021, a lawsuit seeking a declaration that the Agreement's force majeure provision excused its performance during Uri.

33. The phrase "penalties, ratcheted demand or similar charges" did not appear in any communication from Canadian Breaks to JPMorgan regarding the Replacement Price invoices at any time during the 12-month period set forth in Section 5(v) of the Schedule.

34. The phrase "penalties, ratcheted demand or similar charges" is in Canadian Breaks's live Complaint at only one place—when Canadian Breaks quotes the definition of Replacement Price in the context of JPMorgan's obligation to obtain replacement energy in a "commercially reasonably manner." At no point did Canadian Breaks assert in its Original or Amended Complaint that JPMorgan included "penalties, ratcheted demand or similar charges" in its Replacement Price invoices. In fact, when the Court initially asked Canadian Breaks in a December 20, 2023, hearing if it had raised the issue of "penalties, ratcheted demand or similar charges" before it asserted objections to Magistrate Judge Ray's Report and Recommendation on JPMorgan's Motion for Summary Judgment, Canadian Breaks pointed to the brief it filed on June 28, 2023, in response to JPMorgan's Motion for Summary Judgment.

## VIII.  **Canadian Breaks's Initial Payments to JPMorgan**

35. On March 26, 2021, Canadian Breaks paid JPMorgan $19,068,071. In its cover email accompanying the payment, Canadian Breaks characterized the payment as representing "the proceeds received by [Canadian Breaks] from ERCOT for the sale of energy required to be delivered to [JPMorgan] to the extent [Canadian Breaks] could reasonably perform its obligations under the Energy Hedge from February 9, at 3:00 a.m. to February 19, 2021, at 10:59 a.m. Central Time (the 'Force Majeure Period')." Canadian Breaks's March 26 correspondence further stated that Canadian Breaks continued to dispute "whether it owes

[JPMorgan] payment for any other portion of [JPMorgan's] invoices totaling $79,175,323.86."

36. On June 8, 2021, Canadian Breaks paid an additional $3,337,012 to JPMorgan, which Canadian Breaks advised JPMorgan represented additional proceeds it received from ERCOT for energy the Wind Farm generated during the alleged force majeure period.

37. Canadian Breaks's March 26 and June 8 payments total $22,405,083, the price Canadian Breaks recovered for energy, at the ERCOT North Hub, during the alleged force majeure period when its Wind Farm was able to generate energy.

**IX.   Default Remedies and JPMorgan's Pursuit of Foreclosure**

38. The parties' Agreement provides JPMorgan with contractual remedies in the event Canadian Breaks defaults.  The Agreement permits JPMorgan to (1) offset any amounts it owes to Canadian Breaks, by applying outstanding amounts Canadian Breaks owes to JPMorgan; (2) set a date for early termination of the Agreement; and/or (3) commence a foreclosure process with respect to Canadian Breaks's assets, including the Wind Farm.

39. On March 9, 2021, JPMorgan sent Canadian Breaks a letter declaring a Potential Event of Default pursuant to Section 5(a)(i) of the Master Agreement.[6,7]

---

[6] Section 5(a)(i) provides:  "(a) Events of Default.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default . . . with respect to such party:  (i) Failure to Pay or Deliver.  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party[.]" (cleaned up).

[7] On March 9, 2021, JPMorgan removed this action from state court.

40. The Bank of New York Mellon ("BoNY") was the Collateral Agent for the Agreement. On March 25, 2021, Canadian Breaks gave BoNY notice of Canadian Breaks's dispute with JPMorgan's allegation that Events of Default had occurred.

41. On April 30, 2021, JPMorgan's counsel stated the following, at a hearing in this case: "Under the contract documents, JPMorgan has a right to foreclose on the wind farm if it wins this case, essentially. So, if Canadian Breaks has committed a default, a payment default under the--under the documents, JPMorgan has a foreclosure right. Obviously, they [Plaintiff] have asserted force majeure, and so we need to adjudicate this right now before we're able to foreclose."

42. On October 5, 2021, JPMorgan issued a notice to Canadian Breaks designating an early termination of the Agreement effective October 25, 2021. On October 22, 2021, JPMorgan rescinded its early termination notice.

43. On November 24, 2021, BoNY resigned as Collateral Agent.

44. On December 3, 2021, JPMorgan appointed itself as Collateral Agent.

45. On December 22, 2021, JPMorgan replaced itself as Collateral Agent with Wilmington Savings Fund Society, FSB ("WSFS"). WSFS agreed to cooperate with JPMorgan to foreclose on the Wind Farm. WSFS retained the law firm of Arnold & Porter in connection with its role as Collateral Agent.

46. On January 12, 2022, Canadian Breaks sent a letter notifying WSFS of its dispute with the Replacement Price invoices and asked it not to initiate foreclosure until this Court resolved that dispute.

47. JPMorgan engaged Marathon Capital Markets, LLC ("Marathon"), an investment bank, as part of the process for foreclosing on the Wind Farm. In January 2022, Marathon created

a slide deck providing an "[o]pportunity [o]verview" for the sale of the Wind Farm, in which Marathon described its retention by WSFS to sell "up to 100% of the equity interests in the [Wind Farm]."

48. On February 9, 2022, Canadian Breaks requested JPMorgan to identify all amounts allegedly outstanding under the Replacement Price invoices and all costs and fees JPMorgan claimed it was due to halt the foreclosure proceedings.

49. On February 10, 2022, JPMorgan emailed Canadian Breaks a description of $43,424,319.49 allegedly due, and reiterated that JPMorgan planned to send a UCC foreclosure notice on February 15, 2022. It stated it would delay to February 19, 2022, sending the foreclosure notice, if Canadian Breaks would confirm in writing prior to February 15 that payment would be made by February 18. On February 10, 2022, Canadian Breaks confirmed in writing that it would pay under protest $43,424,319.49 by February 18, 2022.

50. On February 17, 2022, Canadian Breaks secured funding from its parent entity, Northleaf Capital, and wired to JPMorgan $43,424,319.49 under protest, and without prejudice, with a full reservation of its claims and defenses ("Payment Under Protest"). The Payment Under Protest consisted of $39,786,062.59 as the outstanding balance under the disputed Replacement Price Invoices ("Balance Payment") and $3,638,256.90 as the amount claimed to be due to JPMorgan's advisors ("Advisors Payment").[8]

51. In or about March 2021, JPMorgan withdrew $4,788,566.56 from the $20 million "Tracking Account," *see supra*, paragraph 9, to reduce the balance on the Replacement

---

[8] Canadian Breaks's correspondence accompanying its Payment Under Protest made no mention of "penalties, ratcheted demand or similar charges."

Price invoices.  Canadian Breaks was not asked to, nor did it specifically, authorize that withdrawal.  JPMorgan withdrew that money without prior notice to Canadian Breaks.

52. Beginning in March 2021 and ending in January 2022, JPMorgan refused to pay Canadian Breaks for the electricity Canadian Breaks delivered to JPMorgan under the Agreement during the months following Winter Storm Uri, totaling $13,064,650.06; instead, JPMorgan offset that amount from the balance reflected on the Replacement Price invoices.

53. To the extent it is a question of fact, this Court finds that Canadian Breaks had a "good faith" basis on which to believe that it could dispute the Replacement Price invoices, because it had declared force majeure and the resolution of that dispute was still pending.

54. To the extent it is a question of fact, this Court finds that Canadian Breaks disputed the correctness of the Replacement Price invoices by disputing them on force majeure grounds.

55. To the extent it is a question of fact, this Court finds that JPMorgan breached the Agreement by engaging in default remedies while a good faith dispute about the correctness of the Replacement Price invoices was pending.  Specifically, JPMorgan breached the Agreement by (1) drawing down the Tracking Account by approximately $4.8 million; (2) withholding payment of approximately $13 million to Canadian Breaks for the portions of electricity Canadian Breaks delivered to JPMorgan under the Agreement after Uri; (3) commencing and substantially proceeding with foreclosure proceedings; and (4) issuing and substantially proceeding with an early termination notice.

56. JPMorgan's breach of the Agreement by engaging in default remedies while a good faith dispute about the correctness of the Replacement Price invoices was pending damaged Canadian Breaks in the amount of $3,638,256.90, the amount of "fees" JPMorgan incurred

during the improper foreclosure process.[9]  Canadian Breaks is also entitled to pre-judgment interest at New York's statutory rate of 9% per annum on $3,638,256.90 from February 17, 2022, to the date of the Final Judgment.  *See infra*, Conclusions of Law, paragraphs 59–60.

57. To the extent it is a question of fact, this Court finds that JPMorgan did not include "penalties, ratcheted demand or similar charges" in its Replacement Price invoices.  *See infra*, Conclusions of Law, paragraphs 21–44.

58. Because JPMorgan did not include "penalties, ratcheted demand or similar charges" in its Replacement Price invoices, JPMorgan did not breach the agreement with Canadian Breaks by including such charges in its Replacement Price invoices.

59. JPMorgan is no longer seeking compensatory damages for its breach of contract counterclaim.  (*See* Joint Pretrial Order, ECF No. 186, p. 19).

60. Any finding of fact contained herein that is more properly a conclusion of law shall be so construed.

## CONCLUSIONS OF LAW

1. New York law governs Canadian Breaks's breach of contract claim.  (ECF No. 138, p. 5 n.3).  To establish a breach of contract under New York law, a party must show by a preponderance of the evidence:  "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.*, 375

---

[9]  JPMorgan conceded at the post-trial oral argument that this figure was not in dispute.

F.3d 168, 177 (2d Cir. 2004); *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  *See also 34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022).

2.  Under New York law, courts construe contracts in accordance with the "parties' intent" and interpret an unambiguous contract on account of the "plain meaning" of its terms.  *See, e.g.*, *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 441 (2d Cir. 2024).  Contracts are read as a whole.  *Id.  See also Suburban Tool & Die Co. v. Century Mold Co., Inc.*, 911 N.Y.S.2d 746, 747 (N.Y. App. Div., 4th Dept. 2010) ("[W]hen interpreting a written contract, the court should give effect to the intent of the parties as revealed by the language and structure of the contract, and should ascertain such intent by examining the document as a whole." (cleaned up) (citation and quotation marks omitted)).

3.  "Absent fraud or mutual mistake, the parol evidence rule precludes a party from offering evidence to contradict or modify an unambiguous contract."  *Polygram Holding, Inc. v. Cafaro*, 839 N.Y.S.2d 493, 493 (N.Y. App. Div., 1st Dep't 2007) (citation omitted).  *See also Quadrant Structured Prods. Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. 2014) ("In construing a contract we look to its language, for a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." (citations and quotation marks omitted)); *Mieco, L.L.C. v. Pioneer Natural Resources USA, Inc.*, 109 F.4th 710, 716 (5th Cir. 2024) (emphasizing in a case concerning a contract governed by New York law that "[a] court may consider extrinsic evidence outside the four corners of the contract only if the language is ambiguous" (citation omitted)).

4.  Whether a contract is ambiguous is a question of law.  *Diesel Props S.r.l*, 631 F.3d at 51 (citations omitted).  So is the meaning of an unambiguous contract.  *Id.* (citations omitted).

16

5. "It is [] a well-settled rule of contract interpretation that where certain things are enumerated, and such enumeration is followed or coupled with a more general description, such general description is commonly understood to cover only things . . . of the same kind or class [] with the particular things mentioned." *Mohr-Lercara v. Oxford Health Ins., Inc.*, 18 CV 1427 (VB), 2022 WL 524059, at *6 (S.D.N.Y. Feb. 22, 2022) (cleaned up) (citation and quotation marks omitted).

## I.    Issue 1:  Penalties, Ratcheted Demand or Similar Charges

6. As the party asserting breach, Canadian Breaks bears the burden of showing by a preponderance of the evidence that JPMorgan breached the Agreement by including penalties, ratcheted demand or similar charges in the Replacement Price invoices it sent to Canadian Breaks.  *See, e.g.*, *Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC*, No. 20cv9622 (DLC), 2022 WL 16833701, at *10 (S.D.N.Y. Nov. 8, 2022) ("The burden of proof on a breach of contract claim is on the party asserting breach." (citing *Moreno-Goody v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021)); *Diesel Props S.r.l.*, 631 F.3d at 52.

### A.  Whether JPMorgan Waived Its Argument that Canadian Breaks Waived Its Ratcheted Demand Claim

7. JPMorgan claims that Canadian Breaks waived its ratcheted demand position, by failing to adhere to Section 5(v)'s notice requirement.  Canadian Breaks in turn claims that JPMorgan waived the Section 5(v) position.

8. Section 5(v) of the Schedule provides, in relevant part:

> Either Party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice or information forming the basis for an invoice, rendered under a Transaction other than any obligation under Section 6 of the Agreement within twelve (12) months of the date such invoice, or adjustment to an invoice, was rendered. . . .  A Party asserting an invoice dispute shall do so in a written notice setting forth the basis for the dispute. . . .  Any dispute with respect to an invoice or invoice adjustment is waived unless the

17

other Party is notified in accordance with this Part 5(v) within twelve
(12) months after the issue date of such invoice or adjustment.

9.  For the reasons described below, JPMorgan did not properly and timely raise its argument
that Canadian Breaks failed to comply with Section 5(v)'s notice requirement.  JPMorgan
therefore waived its argument that Canadian Breaks waived its "penalties, ratcheted
demand or similar charges" claim by failing to comply with Section 5(v)'s notice
requirement.

10. JPMorgan did not raise in either the Pretrial Order or its Answer to Canadian Breaks's
Amended Complaint the issue of whether Canadian Breaks complied with Section 5(v)'s
notice requirement.  *See Martin v. Lee*, 378 F. App'x 393, 395 (5th Cir. 2010) ("If a claim
or issue is omitted from the final pretrial order, it may be waived, even if it appeared in the
complaint." (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir.
1998))).  While JPMorgan mentioned in the Pretrial Order that Canadian Breaks "waived
its right to claim that the [Replacement Price invoices] contain[ed] 'penalties, ratcheted
demand or similar charges,'" this allusion does not constitute a clear position that Canadian
Breaks did not adhere to Section 5(v)'s notice requirement.  *See id.* (finding that the district
court did not abuse its discretion in narrowly construing the pretrial order and finding
waiver as a result).

11. To the extent Canadian Breaks's obligation to adhere to Section 5(v)'s notice requirement
was a condition precedent—which JPMorgan itself contends is the case—JPMorgan failed
to plead failure of that condition precedent with particularity.  *See L.A. Pub. Ins. Adjusters,
Inc. v. Nelson*, 17 F.4th 521, 526 (5th Cir. 2021) ("Under Federal Rule of Civil Procedure
9(c), a party claiming the nonoccurrence of a condition precedent must specifically deny
the occurrence in its initial pleadings, setting forth the allegation with particularity.  And a

18

party who does not deny the occurrence of a condition precedent in a responsive pleading may not later rely on such a theory . . . ." (citation omitted)); *see also Ayres v. Baxter*, No. Civ.A.3:99-CV-2641-L, 2001 WL 294224, at \*4 & n.6 (N.D. Tex. Mar. 27, 2001).[10]

12. The issue of whether Canadian Breaks complied with Section 5(v)'s notice requirement was not tried by consent.  In fact, Canadian Breaks objected to this issue at trial.  The inclusion of JPMorgan's argument that Canadian Breaks did not satisfy Section 5(v) at a late stage of the litigation was prejudicial to Canadian Breaks.  *See Moody v. FMC Corp.*, 995 F.2d 63, 66 (5th Cir. 1993).

13. JPMorgan did not properly preserve its argument that Canadian Breaks waived its "penalties, ratcheted demand or similar charges" claim by failing to adhere to Section 5(v)'s notice requirement.

**B.  Whether Canadian Breaks Waived Its Penalties, Ratcheted Demand or Similar Charges Claim By Failing to Comply with Section 5(v)'s Notice Requirement**

14. If JPMorgan had not waived its position that Canadian Breaks waived its ratcheted demand claim by failing to comply with Section 5(v)'s notice requirement, the Court agrees that Canadian Breaks did not satisfy Section 5(v)'s notice requirement.

---

[10]  Canadian Breaks pleaded generally that it performed, or was excused from performing, its obligations under the Agreement, thereby meeting its burden under Federal Rule of Civil Procedure 9.  *See* Fed. R. Civ. P. 9(c) ("In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed.  But when denying that a condition precedent has occurred or been performed, a party must do so with particularity."); *Carter v. H2R Restaurant Holdings, LLC*, No. 3:16-cv-1554-N-BN, 2017 WL 4174805, at \*9–10 (N.D. Tex. Aug. 1, 2017), *report and recommendation adopted*, 2017 WL 4174800 (N.D. Tex. Sept. 19, 2017).

15. Under the terms of the parties' Agreement, a party must notify the other party within 12 months of the issuance of an invoice that they are disputing an invoice and on what basis. Otherwise, the party waives that dispute.

16. Canadian Breaks highlights three separate events that it claims provided sufficient notice to JPMorgan that it was disputing the Replacement Price invoices on the grounds that they included "penalties, ratcheted demand or similar charges." Each of these supposed notices failed to supply sufficient notice that Canadian Breaks was disputing the Replacement Price invoices on the ground that they included "penalties, ratcheted demand or similar charges."

17. First, Canadian Breaks points to its March 1, 2021, letter, asserting that its discussion of a potential "re-pricing" establishes that JPMorgan was on notice that it was disputing the invoices on the grounds that they included "penalties, ratcheted demand or similar charges." The evidence in the record fails to establish that the parties understood the term "re-pricing" to include "penalties, ratcheted demand or similar charges." This notice did not provide sufficient information to JPMorgan within the relevant 12-month period to understand Canadian Breaks's position.

18. Second, Canadian Breaks points to its March 25, 2021, correspondence, asserting that its contentions that Texas may "reprice" the energy and that the prices were "commercially unreasonable" served as sufficient notice that it was disputing the Replacement Price invoices on the basis that they included "penalties, ratcheted demand or similar charges." Canadian Breaks's discussion of a potential "repric[ing]" event did not give JPMorgan notice of the "basis" on which Canadian Breaks was disputing the Replacement Price invoices, *i.e.*, that they included "penalties, ratcheted demand or similar charges."

Canadian Breaks's assertion in the March 25 letter that the Replacement Price invoices may have included "commercially unreasonable" prices did not provide JPMorgan with sufficient notice of a dispute over whether the Replacement Price invoices included "penalties, ratcheted demand or similar charges." JPMorgan had to *both* purchase replacement energy in a "commercially reasonable manner" and *also* ensure that "penalties, ratcheted demand or similar charges" were not included in the Replacement Price.

19. Third, Canadian Breaks points to Dr. Siddiqi's report, but Dr. Siddiqi expressly disclaimed at trial that his opinion concerned "penalties, ratcheted demand or similar charges." The phrase "penalties, ratcheted demand or similar charges" does not appear in Dr. Siddiqi's report. Dr. Siddiqi's report therefore cannot serve as a basis on which Canadian Breaks provided written notice to JPMorgan that it was disputing the Replacement Price invoices on the ground that they contained "penalties, ratcheted demand or similar charges." The fact that Dr. Siddiqi's report may have concerned potentially improper pricing set by ERCOT during Uri is not enough for this Court to find that Canadian Breaks's disclosure of his report to JPMorgan established that Canadian Breaks provided JPMorgan with

timely notice of the fact that it was disputing the Replacement Price invoices on the ground that they included "penalties, ratcheted demand or similar charges."[11,12]

20. In short, in the relevant 12-month period, Canadian Breaks did not provide to JPMorgan "written notice" that it was disputing the Replacement Price invoices on the "basis" that they included "penalties, ratcheted demand, or similar charges." Canadian Breaks thus did not satisfy Section 5(v)'s notice requirement as to such a contention. Therefore, if JPMorgan had properly raised its argument that Canadian Breaks had waived its "penalties, ratcheted demand or similar charges" claim, Canadian Breaks did not satisfy Section 5(v)'s notice requirement.[13]

---

[11] Canadian Breaks highlights in its post-trial briefing that the Court cited Dr. Siddiqi's report in its summary judgment order as a basis on which the Court found that there was a fact question regarding Canadian Breaks's "penalties, ratcheted demand or similar charges" claim. The Court's mentioning of Dr. Siddiqi's report when it found that JPMorgan failed to meet its burden to show that there was not a fact question at the *summary judgment* phase does not necessarily establish that the report provided JPMorgan with sufficient notice of the fact that Canadian Breaks sought to dispute the Replacement Price invoices on the grounds that they included "penalties, ratcheted demand or similar charges." Similarly, the fact that the Court found that "Canadian Breaks sufficiently asserted the inclusion of unrecoverable charges in the invoices as part of its claim for breach of contract" does not mean that Canadian Breaks satisfied Section 5(v)'s notice requirement. Even if either of such contentions were true, the Court could revisit interlocutory orders. *See Saqui v. Pride Cent. Am., LLC*, 595 F.3d 206, 210–11 (5th Cir. 2010).

[12] In footnote 5 of its post-trial brief, Canadian Breaks points to additional letters and other forms of correspondence in what appears to be an attempt to provide additional evidence that it provided notice sufficient to maintain its "penalties, ratcheted demand or similar charges" claim. These notices did not place JPMorgan on notice that Canadian Breaks was disputing the Replacement Price invoices on the basis that they included "penalties, ratcheted demand or similar charges."

[13] Canadian Breaks argues that, even it failed to provide sufficient notice to JPMorgan, its failure to do so should be excused because JPMorgan "breached the Agreement itself by not providing the 'reasonable detail' as required on the invoices." (ECF No. 194, pp. 39–40). This argument is rejected. As the Court found above, JPMorgan provided "reasonable detail" in the Replacement Price invoices. *See supra*, Finding of Fact, paragraph 29. Not only was JPMorgan not required, as Canadian Breaks suggests, to break down each component of *ERCOT's* pricing,

### C. Whether the Replacement Price Invoices Included Penalties, Ratcheted Demand or Similar Charges

21. JPMorgan did not breach the Agreement by including "penalties" in its Replacement Price invoices issued to Canadian Breaks.

22. The term "penalty" in the Replacement Price is not ambiguous.

23. By definition, a "penalty" is a punishment imposed for a wrong or a breach of a law or rule. *See, e.g.*, *Penalty*, CAMBRIDGE DICTIONARY, https://www.dictionary.cambridge.org/us/dictionary/english/penalty (last visited June 10, 2025) (defining "penalty" as "a punishment, or the usual punishment, for doing something that is against a law"); *Penalty*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/penalty (last visited June 10, 2025) (defining "penalty" as "the suffering in person, rights, or property that is annexed by law or judicial decision to the commission of a crime or public offense"). *See also Citibank, N.A. v. Jacobsen*, 19 Civ. 959 (ER), 2020 WL 7046841, at *4 (S.D.N.Y. Dec. 1, 2020) (noting that New York courts commonly refer to dictionary definitions to determine the plain and ordinary meaning of terms in a contract); *Mieco, L.L.C.*, 109 F.4th at 717 (discussing dictionary definitions to ascertain the plain and ordinary meaning of a term in a contract governed by New York law); *Sullivan v. Gelb*, 1:23-cv-5194-GHW, 2023 WL 8236046, at *2 (S.D.N.Y. Nov. 27, 2023) ("[U]nder New York contract law principles, words such as 'offer' are to be given their ordinary meanings; New York courts commonly use dictionary definitions to determine such meanings. . . . Generally, it is not necessary for courts to take judicial notice of dictionary definitions . . . ." (citations and quotation marks omitted)).[14]

---

but the information about which Canadian Breaks complains was otherwise accessible to it.

[14] To the extent it is necessary for this Court to take judicial notice of the dictionary

24. JPMorgan's Replacement Price invoices included only the actual cost of replacement energy that JPMorgan was forced to purchase from ERCOT at the contemporaneous market prices to fulfill its downstream obligations to BP.

25. The RDPA is not a penalty. It does not punish ERCOT market participants. To the contrary, ERCOT's pricing applies to all market participants and the RDPA is intended to incentivize power generators such as Canadian Breaks to increase their energy production and, thus, the overall supply of energy in the ERCOT system. *Matter of Entrust Energy, Inc.*, 101 F.4th 369, 379 (5th Cir. 2024) (highlighting that the "goal of adders such as the Reliability Deployment Price Adder is to increase the price of electricity on the market to incentivize power generators to make more offers, thereby addressing the discrepancy between supply and demand that led to the scarcity").

26. Indeed, Canadian Breaks had some benefit from the RDPA's addition to the price of energy during the Storm, because it received the $9,000 market price—including the value of the RDPA adder when in place—for the energy it generated and sold to ERCOT.

27. JPMorgan did not breach the Agreement by including "ratcheted demand" charges in its Replacement Price invoices issued to Canadian Breaks.

28. The parties agree on the meaning of "ratcheted demand." (*See* ECF No. 197, p. 25 (Canadian Breaks noting in its post-trial reply brief that "JPMorgan correctly observes that

---

definitions contained herein, the Court does so. *See, e.g.*, *ContourMed Inc. v. Am. Breast Care L.P.*, CIVIL ACTION H-15-2769, 2016 WL 1059531, at *2 (S.D. Tex. Mar. 17, 2016) ("[J]udicial notice of matters of public record is limited to materials like general historical observations, court orders, administrative publications, and *dictionary definitions*." (citation omitted) (emphasis added)); *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) ("Dictionary definitions are also a proper subject for judicial notice." (citation omitted)); *see also Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 803 (9th Cir. 1989).

the parties agree on the industry meaning of a 'ratcheted demand' charge"); ECF No. 194, p. 45 ("[T]he parties have no dispute about the industry meaning of a 'ratcheted demand' charge.")).

29. "'[R]atcheted demand' is a term of art in the power industry that refers to a billing methodology whereby a specific customer is charged the greater of: (1) the customer's peak demand for power in the current month, or (2) a fixed percentage of that customer's peak demand for power during the prior year." (ECF No. 196, pp. 23–24). (*See also* ECF No. 194, p. 45).

30. The ERCOT wholesale market that JPMorgan and Canadian Breaks transact in, however, is an "energy-only" market that does not establish pricing based on transmission or distribution of power, with market prices denominated in $/MWh. *Luminant*, 691 S.W.3d at 454 ("Texas maintains an 'energy only' market in which generators are compensated only for the energy they actually produce, as opposed to a 'capacity market' in which generators are paid to maintain capacity for times of high demand.").

31. The RDPA does not constitute either a ratcheted demand or a "similar charge" under the Agreement's definition of Replacement Price.

32. The common denominator between penalties and ratcheted demand charges is that they are additional costs imposed on a specific buyer due to conduct or activity by the buyer independent from the purchase of replacement energy.

33. When the RDPA adder is in place, market participants must pay the adder when purchasing energy from ERCOT, and energy generators are paid the adder when they generate and deliver electricity into the ERCOT system.

34. The RDPA is not similar to penalties or ratcheted demand charges for the reasons set forth above. As the Fifth Circuit has explained:

> The price of electricity on the [ERCOT] markets is set using several variables. One such variable is the "Reliability Deployment Price Adder," which—in broad terms—is one way that ERCOT accounts for scarcity of supply in the grid. . . . The goal of adders such as the Reliability Deployment Price Adder is to increase the price of electricity on the market to incentivize power generators to make more offers, thereby addressing the discrepancy between supply and demand that led to the scarcity.

*Matter of Entrust Energy, Inc.*, 101 F.4th at 379 (citations omitted).

35. RDPA does not resemble penalties or ratcheted demand. It does not seek to punish market participants for violations of market rules, nor does it charge a specific customer based on that customer's previous level of demand.

36. The existence of some commonalities between RDPA charges and penalties or ratcheted demand is an insufficient basis on which the Court can find that the RDPA is a "similar charge" as that term is used in the Agreement. For example, while "penalties" might incentivize or disincentivize behavior—as do all pricing mechanisms to a degree—the purpose of a penalty is distinct from the purpose of the RDPA. Accordingly, the general fact that penalties and RDPA charges may have the ultimate consequence of incentivizing or disincentivizing behavior does not establish that the RDPA is a charge "similar" to a "penalty" as that term is used in the Agreement.

37. RDPA charges do not fall within the exclusions for "penalties, ratcheted demand or similar charges" in the Agreement's definition of Replacement Price.

38. Even if the Court were to find the clause "penalties, ratcheted demand or similar charges" to be ambiguous, the parties' course of performance demonstrates that they did not intend "penalties, ratcheted demand or similar charges" to apply to the RDPA.[15]

39. Under New York law, "the parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties." *Soberman v. Groff Studios Corp.*, No. 99 Civ. 1005(DLC), 2000 WL 328781, at *6 (S.D.N.Y. Mar. 28, 2000) (quoting *Fed. Ins. Co. v. America's Home Ins. Co.*, 691 N.Y.S.2d 508, 512 (N.Y. App. Div., 1st Dep't 1999)). *See also IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) ("There is no surer way to find out what parties meant, than to see what they have done." (citation omitted)).

40. Here, in the immediate aftermath of Uri, Canadian Breaks made payments to JPMorgan that included amounts attributable to the RDPA. *See supra*, Findings of Fact, paragraphs 35–37.

41. This course of performance is evidence that the parties did not intend for the phrase "penalties, ratcheted demand or similar charges" to apply to the RDPA charges.

42. Dr. Siddiqi's report does not establish that JPMorgan included "penalties, ratcheted demand or similar charges" in its Replacement Price invoices, nor did it give notice that

---

[15] The Court recognizes that, while the determination of whether a contract is ambiguous is a question of law, "the meaning of [an] ambiguous contract [is] a question of fact for the factfinder." *Revitalizing Auto Cmtys.*, 92 F.4th at 441–42 (citations and quotation marks omitted). Thus, although a conclusion regarding the interpretation of the phrase "penalties, ratcheted demand or similar charges," if these terms are ambiguous, might be better stated as a finding of fact, the Court leaves here, for simplicity's sake and because it does not find that the Agreement's terms are ambiguous, its analysis of how it would have construed and applied these terms had it found them ambiguous. *See also Hong v. Renval Construction, LLC*, 194 N.Y.S.3d 541, 542 (N.Y. Sup. Ct. 2023) ("When the language of a contract is ambiguous, its construction presents a question of fact . . . ." (citations and quotation marks omitted)).

Canadian Breaks was disputing the correctness of the Replacement Price invoices on the grounds that they included "penalties, ratcheted demand or similar charges." The fact that Dr. Siddiqi's report did not opine on "penalties, ratcheted demand or similar charges" is problematic for Canadian Breaks, as Dr. Siddiqi's report serves as the basis for Canadian Breaks's proposed calculations associated with its "penalties, ratcheted demand or similar charges" claim.

43. Because JPMorgan did not breach the Agreement by including "penalties, ratcheted demand or similar charges" in the Replacement Price invoices, Canadian Breaks is not entitled to recover from JPMorgan for this alleged breach.

44. The Court would have found that the Replacement Price invoices did not include "penalties, ratcheted demand or similar charges" even if it was JPMorgan, not Canadian Breaks, who bore the burden of proof that it did not include "penalties, ratcheted demand or similar charges" in its Replacement Price invoices.

## II.    Issue 2:  Default Remedies

### A.  Good Faith Dispute

45. Section 5(v) of the Schedule provides, in relevant part: "Either Party may, in *good faith*, dispute the correctness of any invoice or any adjustment to an invoice or information forming the basis for an invoice. . . .  Payment of disputed amounts shall not be required while a dispute is pending." (emphasis added).

46. The parties dispute whether, as required by Section 5(v), Canadian Breaks disputed the Replacement Price invoices in "good faith."

47. The Court gives the Agreement's unambiguous term "good faith" its plain meaning.  The record lacks evidence that Canadian Breaks had "malice" or "a design to defraud or to seek

an unconscionable advantage" when it disputed the Replacement Price invoices based on its force majeure declaration. *Ashokan Water Servs., Inc. v. New Start, LLC*, 807 N.Y.S.2d 550, 554 (N.Y. Civ. Ct., Kings Cnty. 2006) (finding that "good faith" "encompasses, among other things, an honest belief, the absence of malice and the absence of a design to defraud or to seek an unconscionable advantage" (quoting *Doyle v. Gordon*, 158 N.Y.S.2d 248, 259 (N.Y. Sup. Ct. 1954))). *See also Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277, 291 (S.D.N.Y. 1997) (quoting Black's Law Dictionary 693 (6th ed. 1990) for what constitutes "good faith," or "an honest belief, the absence of malice and the absence of design to defraud or to seek unconscionable advantage" (quotation marks omitted)). Instead, the evidence informs that Canadian Breaks's actions were based on an honest belief and a reasonable basis that its declaration of force majeure was proper in light of the circumstances. *See Connelly v. McGoldrick*, 133 N.Y.S.2d 327, 328 (N.Y. Sup. Ct. 1954) ("Where there is reasonable basis for a man's acts, a finding of good faith in them naturally follows in the absence of evidence reasonably supporting an inference of some improper motive for them."). *See also Polotti v. Flemming*, 277 F.2d 864, 868 (2d Cir. 1960) ("The fact that a person could have adopted a more prudent course than the course taken does not prevent him from establishing that the course taken was one taken in good faith."); *Allen*, 11 F. Supp. 2d at 291 (noting that "it follows" from Black's Law Dictionary's definition of good faith that "one could act both 'in good faith' and 'negligently'").

48. Based on the facts recited in the Findings of Fact, paragraphs 16–24, *supra*, Canadian Breaks disputed the Replacement Price invoices in "good faith" as required by Section 5(v) when it invoked its force majeure declaration.

### B. Meaning and Application of "Correctness"

49. Section 5(v) of the Schedule provides, in relevant part: "Either Party may, in good faith, dispute the *correctness* of any invoice or any adjustment to an invoice or information forming the basis for an invoice. . . . Payment of disputed amounts shall not be required while a dispute is pending." (emphasis added).

50. The parties disagree about whether Canadian Breaks disputed the "correctness" of the Replacement Price invoices by invoking its force majeure declaration.[16]

51. JPMorgan asserts that Section 5(v)'s use of "correctness" limits the applicability of the provision to disputes over the accuracy of an invoice, or, in other words, to computation disputes regarding whether the invoices are mathematically correct. Canadian Breaks asserts that the term "correctness" should be interpreted broadly to encompass challenges to the "validity" of an invoice.

52. The term "correctness" as used in Section 5(v) unambiguously encompasses challenges to the validity of an invoice, and is not confined to disputes only about the accuracy of the computations in an invoice. Dictionary definitions for "correctness" include, among others, "the quality of being in agreement with the true facts." *Correctness*, CAMBRIDGE DICTIONARY, https://www.dictionary.cambridge.org/us/dictionary/english/correctness (last visited June 10, 2025). *See also Correctness*, DICTIONARY.COM, https://www.dictionary.com/browse/correctness (last visited June 10, 2025) (defining "correctness" as "conformity to fact or truth"); *Correct*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/correctness (last visited June 10, 2025)

---

[16] Canadian Breaks contends that it also disputed the correctness of the Replacement Price invoices on the ground that they included "penalties, ratcheted demand or similar charges." The Court rejects this argument. *See supra*, Conclusions of Law, paragraphs 14–44.

(defining "correct" as the adjective form of the noun "correctness" to mean "conforming to an approved or conventional standard").

53. This reading of "correctness" is bolstered by the fact that the Agreement expressly includes language describing "computational" disputes in other provisions, suggesting that the parties did not intend to so limit the use of the word "correctness" in Section 5(v). *See Vertin*, 16 N.E.3d at 1172 ("Even where there is ambiguity, if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.").

54. The Court will not read limitations into specific provisions of a contract not otherwise included therein, especially where, as here, the parties are both sophisticated. *See Ashekian v. Cresco Labs LLC*, 220 N.Y.S.3d 699, 700 (N.Y. App. Div., 1st Dep't 2024) (emphasizing the sophistication of the parties when interpreting an agreement); *Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, N.A. v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017) (emphasizing that courts will not "add or excise terms or distort the meaning of any particular words or phrases" when interpreting the parties' agreement); *see also Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022).

55. Because the term "correctness" as used in Section 5(v) includes challenges to the validity of an invoice and is not confined to disputes solely about the accuracy of the computations included therein, Canadian Breaks's good faith invocation of force majeure falls within Section 5(v)'s purview.

## C. JPMorgan's Exercise of Default Remedies While a Good Faith Dispute Was Pending

56. As the party asserting breach, Canadian Breaks bears the burden of showing that JPMorgan breached the Agreement's invoice disputes provision by exercising default remedies while

a good-faith dispute under Section 5(v) was pending. *See, e.g.*, *Trez Cap. (Fla.) Corp.*, *supra*, at *10 ("The burden of proof on a breach of contract claim is on the party asserting breach." (citing *Moreno-Goody*, 7 F.4th at 85)); *Diesel Props S.r.l.*, 631 F.3d at 52.

57. Canadian Breaks met its burden on this issue, having proved that JPMorgan engaged in the following actions while a "good faith" dispute regarding the "correctness" of the Replacement Price invoices under Section 5(v) was "pending":  (a) drawing down on the Tracking Account without consent to pay the disputed invoices in part; (b) failing to pay the fixed leg portion of the electricity that Canadian Breaks delivered to JPMorgan under the Agreement without Canadian Breaks's consent to use that sum as an offset to pay down the disputed Replacement Price invoices in the months following Uri; (c) threatening to terminate the Agreement early and issuing an early termination notice; and (d) initiating a foreclosure on Canadian Breaks's ownership interest in the Wind Farm and demanding Canadian Breaks pay the remaining balance of the disputed Replacement Price invoices, plus fees and costs, to end the foreclosure process. *See supra*, Findings of Fact, paragraph 55.

58. JPMorgan's actions described in the immediately preceding paragraph constitute a breach of the Agreement, because a good faith dispute about the correctness of the invoices under Section 5(v) was still pending.

**D.  Damages Resulting from JPMorgan's Breach by Exercising Default Remedies**

59. As a result of JPMorgan's breach described in Conclusions of Law, paragraphs 57–58, *supra*, Canadian Breaks is entitled to damages in the amount of $3,638,256.90.[17] *See, e.g.*,

---

[17] Approximately $3.6 million in damages are the "fees" portion of the $43,424,319.49 Canadian Breaks paid to JPMorgan "to terminate the foreclosure process [JPMorgan] commenced in October 2021."  The Court does not award as damages the remaining $39,786,062.59 of

*Bierer v. Glaze, Inc.*, No. CV-05-2459 (CPS), 2006 WL 2882569, at *10 (E.D.N.Y Oct. 6, 2006) ("Because Plaintiff has prevailed on the breach of contract claim, Plaintiff may be entitled to damages." (citing *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 629 (2000) (identifying damages as "the usual remedy for breach of contract"); Restatement (Second) of Contracts § 346(1) (1981) ("The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged.")))

### III.    Pre-judgment Interest and Attorneys' Fees

60. Canadian Breaks is entitled to pre-judgment interest at New York's statutory rate of 9% per annum on $3,638,256.90 from February 17, 2022, to the date of the Final Judgment.

61. Whether the parties are entitled to attorneys' fees, and if so, in what amount, will be determined at a subsequent date.

62. Any conclusion of law that is more properly a finding of fact shall be so construed.

**SO ORDERED**.

June 10, 2025.

BARBARA M. G. LYNN
SENIOR UNITED STATES DISTRICT JUDGE

---

Canadian Breaks's February 2022 payment to JPMorgan, *i.e.*, the "Outstanding Balance," as its finding against Canadian Breaks on the parties' remaining disputes entitles JPMorgan to retain Canadian Breaks's payment of the Outstanding Balance.